Alright, as my pleasure, the business is now in session. I would like to introduce you to the Chief Capital Bills Provider. Good morning and please be seated. Madam Clerk, will you please call the first case. Well, as you can see now, Mr. Mutual Insurance v. Tracy's Treasures, Inc. Okay, I'd like the attorneys who are going to argue this case this morning to step up to the podium. I want you to tell me your names, who you represent, and approximately how long your argument will take. Good morning, counsel. Good morning, Your Honor. My name is Tony Berlulis from Mutschellest. I'm representing the policyholder, Tracy's Treasures, and the class representative in class, Paul Idlitz. They are the appellants in this case. Okay, how long will your argument take, counsel? I would like to add ten minutes for my argument and five minutes for rebuttal. Very good. Good morning, counsel. Good morning, Your Honor. William Savino. My law firm is Rivkin Radler, LLP, representing Central Mutual Insurance Company. And my request would be for twenty minutes. Very good. Okay. Please proceed, counsel. Thank you, Your Honor. Good morning, Your Honors. This case is the latest attempt by the insurance industry, in this case Central Michigan, to avoid their obligations to cover flashback TCPA cases. Despite being told twice by the Illinois Supreme Court in the Swiderski case and in the most recent Lay case that these types of cases are covered. Ironically, the one issue that decided the lower court decision was whether or not TCPA damages, liquidated damages, are a penalty and therefore not covered by insurance. That was resolved completely by the Lay decision, recent Lay decision by the Illinois Supreme Court, and said they are not a penalty and upheld that they were covered under the TCPA. Central nevertheless has raised a number of arguments as to why, regardless of that decision, they should still not be covered. There are a number of issues in this case, and I'm prepared to answer any questions on all of them. But because of the limited amount of time, and the briefs are pretty good. I didn't do them. I was brought in later. But on both sides, I think the briefs laid forth the issues pretty well. I want to deal with what I think are the five main issues. First, are liquidated damages covered? The answer, yes. Did Tracy's treasurers commit a fraud on the court? The answer, no. Was the settlement objectively reasonable under the Enum standard? The answer is yes. Was Central entitled to notice of the settlement? The answer is no. And was this buyout of the policy in the White case that happened years before, was that effective against these claimants? And the answer to that is no. One at a time. Liquidated damages are covered. This was decided, really, by the Swiderski case and the Lay case. Liquidated damages are not penalties. And we all know what a liquidated damage is. Liquidated damages, as opposed to a penalty, is the amount necessary to compensate somebody for damages that are real, but are hard to calculate. So it's a reasonable approximation of what difficult damages are. By the Illinois Supreme Court saying that these liquidated damages are not a penalty, they said that they are compensation. They're covered. They're the amount necessary to right the wrong. And one thing we've got to keep in mind, the damages here are more than just the loss of the ink and the loss of the paper. There is an intrusion on seclusion. That was the basis of the court. If Central's right and it bought out the advertising injury coverage, that's out the window, right? If they bought out the advertising injury coverage, it would be out the window. So if Central bought out the advertising injury coverage, what Tracy's and Idler's are left with is property damage. That is correct. But the buyout was not effective against these claimants because their rights had already vested. I just want to get your position. If the buyout was effective, we're only talking about property damage. I think that is correct. And that's pennies, right? Oh, no, because the property damage, again, is more than just the ink and more than just the paper that's lost because you have to look at what happened. The fax machine is being used at that time because of these blast faxes. Property damage has a meaning under Central's policy, and it's injury to tangible property, right? Yes. Okay. So to quantify that in terms of the receipt of a piece of paper on a fax machine, you're talking about a nominal sum of money, right? Yes, probably, but I'm not really ready to concede that because when fax machines themselves are being used, the value of that fax machine is going down. They have a useful life. And the more blast fax that goes through it, the more it runs, the more likely they're going to have to repair it. That damages hundreds of dollars. But that might be true in the universal sense, but in terms of the injury from the fax that Tracy sent, the piece of paper that Tracy sent. Yes. That's all we're concerned about in this case, right? I mean, it would be the policyholder's burden to show what the damage was as a result of the receipt of this fax, not the receipt of hundreds of faxes sent by other people. Well, actually, no, Judge. With all due respect, the statute sets forth what the damages are, and that's $500 per fax. They don't have to show anything more than that. My point is that the underlying damages are difficult to determine because it's not just the ink and paper. It could be, in fact, the loss of the use of the machine during that period of time, a damage to the machine, it wears it down, and that's hard to determine what that damage is. So the statute sets forth $500 as liquidated damages, and liquidated damages are compensable. The second issue, and going back to advertising injury, there is an inclusion on seclusion, intrusion on seclusion, and that damage, again, is real, it's a real injury, hard to determine, and the Congress set forth $500 to cover that, up to $1,500 if it's willful. So, second issue. Tracy did not lie to the court in the class action case or to Central. In fact, Tracy accurately told the court that Central had denied the duty to defend and indemnify. Well, what Tracy said in her affidavit was that Central refused to defend Tracy's. Central paid the attorney's fees not only for Mr. Offenbach but for Mr. Ellis, right? No. First off, Central said even when they paid it, and their own language was they hired panel counsel, which I will explain why that was wrong in and of itself because there was a conflict and they had no right to pick panel counsel without disclosing the conflict, which they didn't do. They disclosed perfectly to Tracy that we contend there is no coverage under our policy. We are providing you what we refer to as a courtesy defense that prevents Tracy's from being defaulted in the Lake County case, and they paid for it. They also reserved their right. There was also a reservation of rights. That's interesting because they were trying to have the cake and eat it to them, right? Eat their cake and have it to them because they said, no, we don't have to make it. This is not a reservation of rights because PECRAS doesn't apply. They were trying to be very cute by this, and, Judge, I disagree that they made a full disclosure. The conflict here was not just that they declined coverage. The conflict is they appointed their own panel counsel who took part in this case for many months, including crucial discovery, when, if there was a finding in the lower court of liability and Tracy was merely negligent, there would be coverage. However, if there was a finding of liability in the lower court and it was found to be willful, there would arguably be no coverage. They had an obligation to tell Tracy that. They didn't do it. With respect to panel counsel, I mean, with respect to eventually counsel, Tracy did obtain their own independent counsel who was charged with $250 an hour, not a huge amount in this day and age. The insurance company, however, said, we will only pay you panel counsel rates. We will only pay you $172 per hour. But what I'm focusing on is the representation in Ms. Tracy's affidavit to the Lake County Court that Central is refusing to defend us, and that's not entirely true, is it? Well, I think the representation was Central has denied the duty to defend and coverage, and that is true. No, the representation was that Central has refused to defend us. Just so that I understand your position, is your position unless Central paid $250 to Mr. Owens, they were not providing a defense? Yes, that is my position. The law is clear that when there is a conflict and there's a reservation of rights, which in effect that's what they were doing. They had an irreconcilable conflict. Under Peppers, the policyholder has the right to appoint for themselves independent counsel. And then the insurance company has reached its duty to defend by paying the reasonable amount of their defense cost, including fees. $250 per hour is a reasonable amount. They wouldn't pay it. That's not fulfilling their duty to defend. That is not defending them. Is there anything in the record of communication from Tracy's to Central saying we don't believe that you're acting reasonably and refusing to pay Mr. Ellis his full hourly rate? Mr. Ellis set forth in his letter of – not exactly, but close. Mr. Ellis set forth in his letter of – What page is that letter in the record? It's C04933, the December 12th letter to 2007 from Mr. Ellis to Central. That's his first letter to Central, right? Yes, in which he says that he expects him to pay his reasonable rate of $250 an hour. But is there a communication after that when Central says we will pay $170, whatever, that we believe you have now reached your duty? No, I don't believe there is such a letter in the record, nor do I believe it's necessary. I mean, it's a little bit – Central didn't disclose the conflict. They have their own panel counsel who is in a conflict doing discovery. They then refuse to pay the full amount. Central also said that they were not paying pursuant to PEPRS. They made that explicit statement that they believe PEPRS didn't apply. And yet – so they didn't make any of the disclosures that were necessary in order for them to fulfill their duty. And it's a little bit unfair to say then by paying $172 an hour, they fulfilled their duty under those circumstances simply because in the short period of time after Mr. Ellis got in to a case in which there was huge liability, huge liability, potential liability, that he was able to settle it, that he didn't come back and say you should have paid – that's a breach of the duty of defense. In fact, he was negotiating a settlement several weeks before December 12th, right? He was starting to talk about a settlement, yes. He did not finalize it beforehand? Well, when was the motion for preliminary approval filed? In January of 2008. Okay. So within a month of him coming in to this enormous case, he's negotiated a class-wide settlement. Yes. And why wouldn't he have? Look at this situation. He's representing Tracy.  Not one piece – not any obligation to Central. His only obligation is – I'm sorry. I thought the Central policy requires that they keep Central informed of any legal documents, of any motions, of any subpoenas, anything that goes on in the case. Not when there's a reconcilable conflict, not when there's a breach of duty of defense. But what's inside the breach? Not when there's a reconcilable conflict. Then they surrender the control of the case. That's what the Miyota case said. In the contract, in the policy, it says – talking about legal action, they say – first of all, they say judgment obtained after an actual trial, which this wasn't. Then they're talking about a settlement. They say, a settlement and a release of liability signed by us, the insured, the claimant, and the claimant's legal representative. No insured will voluntarily make payment, assume any obligation, or incur any expense without our consent. You must send us copies of demands, notices, summonses, and legal papers received in connection with the claim or suit. What about that tells you that they weren't required to tell Central what was going on? The case law. The case law says – Well, this is the contract. Judge – She signed it. They signed it. The case is – I understand what the contract is. But when they surrender their controls – They didn't surrender their controls. Yes, they did. This contract says they didn't surrender their controls. That they were allowing for settlements. That they understood that there would be settlements. That there might be other attorneys involved in those settlements. But they wanted to be kept informed. I understand the court's point, but let me try to explain it. They surrendered control when they refused – when they declined coverage, both the duty to defend and duty to identify. Then when they chose panel counsel within a reconcilable conflict and didn't disclose the conflict. Then when independent counsel came in, which it had a right to do, because Central was obligated to allow tracees to have their own independent counsel. In that situation, the case law – This language of voluntary payment is in all the cases. I mean, in all of the situations. But in that situation, they have surrendered control of the defense of the case because of the reconcilable conflict, and that provision doesn't apply. That's the law. This isn't control of the case. This is notice about what's going on in the case. Notice about what's happening with their money. They have a right to that. Well, not when they surrender control. They have no right to notice, and they have no right – because there's nothing they can do. They can't object to the settlement. That's the point. But wait a second. That's where the problem is. Because you're settling with Central's money. Yes. And you say that Central has no opportunity to be heard about whether any excess leftover of the $14 million should go back to Central or should be distributed through Cypress. They don't get to say anything about that. No, they don't, and they're protected because – and this is really the crux of this case. All of this stuff is really ultimately irrelevant because it's Gein that controls. Gein recognized, as the court's pointing out, the difficulties in arm's-length transactions, in collusion, when you have a situation where you're negotiating a settlement, that the insurance company is going to pay it. Gein recognized – that was my case, by the way. I argued that before the Illinois Supreme Court. They recognized that problem, and they said it's inherent. It's okay. We have another way to protect against collusion. We have another way to protect the insurance company. We protect it by making the determination of whatever the deal that was reached, was it a reasonable, fair deal if you're looking at it through the eyes of a prudent uninsured? And so isn't that a question of fact in this case? It is often a question of fact. It is not a question of fact in this case because I think you can, on the record before this court, you can make a determination that this settlement was inherently reasonable, and I'll tell you why. There was $40,000 to $100,000 taxes involved. No, it was $90,000 to $120,000 is what Tracy's and Idler's claim. Yes, and I was using their number in the low end. You got roughly 10,000 names in discovery. Right. That's it. But the damage is per fact, not per name, Judge. And of the 10,000 that actually received, ironically, the fax blast notice of the class action, you've got approximately 5,000 who responded. That's it. Right? Did anybody respond to the published notice? Well, they didn't opt out. No. Did anybody? No. This notice was sent out in 2008. What has happened in Lake County with the claims process? The claims process is on hold. Oh, it's on hold. It's on hold. It hasn't gone forward. But you don't look at it in hindsight. You look at it when they settled the case. And it's not the number of members of the class that's relevant, because each one of those members may have had 5, 10, 15, 20 faxes. It's the number of faxes. Even Central admits that the number of faxes was approximately 40,000 at the low end, to much more. So you're looking at damages between 500 and 1,500 per fact, not per person. And you've got to look at it. A court cannot look at the fact that the experience in the rate of response in these cases is something well under double digits. People don't file claims in these cases. The courts don't look at that, Judge. Let's put ourselves in the class action case at the Fairness Hearing. What is the court looking at there? The court is looking at whether or not the class was sold out. Not the insurance company. That's not an issue. They're looking to make sure that the defendant and plaintiff's counsel didn't make a sweet high deal that screwed the class. They look to see if the class, if the amount being paid to the class was high enough. You have never heard in any class action hearing case that they throw out a settlement because it was too much. That's not an issue before the court in the hearing case. It does come up in the context like this, where the insured is settling with somebody else's money. It does come up in the context of collusive settlement. But Deanne deals with the question of collusive by just looking at the amount and the circumstances from an uninsured. Let's look at what an uninsured would do here. An uninsured is getting no payment on their fees, by the way. The counsel would say it's a reasonably prudent uninsured. A reasonably prudent uninsured. I'm representing a reasonably prudent uninsured. They're being sued under a class action case. But as she points out, without their money, they're settling this case. It's not their money. But they haven't settled it yet. I'm looking at it from the point of view of a prudent uninsured. And a prudent uninsured, you don't look at it as whether or not it's their money because that's the whole point of the Deanne case. You take the insurance out of it. I'm a prudent uninsured. I'm looking at the risk of these cases. And, you know, there are defenses. All of them are risky. I'm going to have to pay for those on my own. I'm going to have to litigate it to the end, and there's still a high likelihood I'm going to lose. There's a high likelihood the class is going to be certified. Ninety percent of them are certified. There are a few that aren't. A prudent uninsured would not file a motion to dismiss in 2007 based on the statute of limitations. They might have. They might not have. But that isn't the question. The question is whether the settlement is reasonable, not what actions a prudent uninsured would defend. Isn't it all part of the same package? Don't you have to look at the whole behavior, what a prudent uninsured would do? For example, why isn't prudent uninsured going after the fax blasters? Well, first off, there's a real question whether or not there's a right of contribution. The U.S. Supreme Court has held in several cases that there is no right of contribution unless it's perfectly stated in the statute. Well, she's relying on in her affidavit that the fax blasters told her. We don't have anything in writing, of course. We just have her affidavit saying, Oh, the fax blasters told me all of these 100,000 faxes were wrong. Correct. But you may not have had a claim. To overcome the policies clause that says we're not going to pay for this if you know that it's illegal. But it's not a defense. That would have been a chance they would have to litigate against the third party if they had a contribution claim. They'd have to collect money and offset it. It's not a defense to the class action itself. But I think it's my point. My point is I'm representing this uninsured. They're going to have to pay everything out of their own money. And the defendants come to me and say, You've got a potential liability of $100 million, $60 million to $100 million. I want to give you a blue plate special today. You can settle it for $14 million. That is a fraction of what their potential liability is. They don't have to incur these risky defenses. They don't have to go out of pocket to continue to defend the case. Why do I have to turn down an offer that I really can't refuse? What interest does a prudent uninsured have in not getting any balance of the settlement fund back and instead agreeing to have it distributed through SIPRE? Your Honor, that's not a... Would a prudent uninsured who's settling with their own money say, Fine, we'll agree to have any excess funds distributed through SIPRE? Then you're the likely response? Well, if you want that, then we want more money. The point of that is this is such a small fraction of what their risk is that a prudent uninsured would give that up. Why wouldn't they? Because if they start negotiating they want some of the money back or to go to SIPRE, then I know what the plaintiff's counsel, the class action counsel, is going to say, Well, then you've got to pay more. We're giving you a rock-bottom amount. But what we're looking at is a prudent uninsured, not with unlimited funds, and a prudent uninsured who says, like many defendants in class actions do, If you want more money, I'm going to go down to 219 South Dearborn and file my bankruptcy petition. Good luck. Well, Illinois doesn't have a case on point on this. Arizona does. And they said when you're looking at it from the point of view of a prudent uninsured, the only thing that makes sense is to look at that uninsured as if that person or entity had the right, had enough money to pay the settlement funds. That's how you have to look at it. Otherwise, if you look at it from the point of view that the prudent uninsured is facing bankruptcy, you have a situation where the insurance companies will never defend somebody who doesn't have a lot of money because they figure then their liability is going to be limited to what their net assets are. So why would they defend? They're only going to end up defending the people. Well, if they refuse to defend in bad faith, then they're looking at extra contractual damages beyond the face amount of the policy. So they do have an incentive to act reasonably. It's a small incentive. Section 155 damages in Illinois are not particularly scary to insurance companies, frankly. They get attorney's fees. They get that alleged penalty. This is not a situation where they would necessarily be getting an excess. An excess is not even an issue here. But let's look at it this way, too. It makes more sense, even if they're going to go on bankruptcy, it makes more sense for the defendant to settle a case at a smaller amount even if it meant it was going to go on bankruptcy. For instance, they have a $14 million settlement. They may not have enough money to pay it, so they have to go on bankruptcy versus litigating it and probably getting the $60 or $100 million and then going on bankruptcy. One of the things you do on bankruptcy is reorganize. You can reorganize a debt of $14 million a heck of a lot better than you can reorganize a debt of $100 million. So, again, from the point of view of an insurer, there's sufficient facts here because of the nature of the case, because of the difficulty of the defenses. And they are difficult and risky, and the fact that an uninsured would have to pay for that all out of his or her own pocket, it makes sense that $125 per fax is what it came down to. She wasn't paying for it out of her own pocket. Pardon? She wasn't paying for it out of her own pocket. But the test, again, is to look at it as a prudent uninsured, and that is somebody who is not getting their fees paid. And she was paying $80 an hour out of her own pocket, so she had to litigate it, and she still had to go out of pocket. Is there any evidence in the record that Ms. Tracy paid $80 an hour out of her own pocket? Against his record, is that what he was charging her? Well, my question is, is there any evidence in the record that she paid the excess? No, I don't know. I don't think there is any one way or the other. She was certainly liable for it. Whether she made the payment or not, I don't know. And I don't think the record respects whether she actually made the payment. But she was liable for it, because that's what counsel, the only evidence in the record is that he was charging her $250. They were agreeing to pay $172. Both of those numbers are outrageous. I mean, even $250 an hour is low in this world. This is $250 an hour on top of this $33 1 3rd. No. Well, the Lake County settlement includes a $33 1 3rd number, doesn't it? That goes to the class action plaintiff, not Tracy's counsel. The class action plaintiffs who settled the case and are the assignees, they obtained from the common fund the total settlement, 1 3rd. Tracy, to defend it, was paying out-of-pocket. No contingency there. They were paying out-of-pocket. And she was obligated for $78 an hour. And the fact that these attorneys had this correspondence shouldn't concern us at all? I'm sorry, Justice, what correspondence? The fact that the attorneys, the two attorneys, the plaintiff's attorneys and Tracy's defense attorney had this interesting correspondence in the three months that they were corresponding shouldn't concern us at all? You're still on your number two issue. Yeah, but I'll deal with that, of course. No, it shouldn't. I mean, it's just interesting correspondence in the eye of the beholder. One of the letters said, you know, so-and-so is on board. On board to what? On board for the substitution? On board to a settlement? Settlements are, you know, I'm negotiating to have my client and I tell the other side, I got my client on board, we're ready to go on the settlement. The question, all of those issues under Guillen are irrelevant if you just look at the settlement and determine if the settlement is reasonable to a prudent uninsured. Because it doesn't matter otherwise. Okay. I was just curious when I read all this correspondence in the record, we have these emails back and forth between the defense attorney and the plaintiff's attorney, but we don't have any correspondence about the settlement. They were doing all of that in person or by phone, presumably? I can only go by the record. I was not involved in that. I can't answer that. So in three or four months, they figured out they were going to do $14 million over the phone, nothing in writing. And the only thing in writing is call me, she's on board. I don't think we can make that assumption. I'm not making an assumption. That's what the record shows. They had this correspondence. They didn't have any correspondence about the actual dollar amounts or the number of claimants or no numbers. There were no numbers in any correspondence. As far as we know, that is correct. On the other hand, it doesn't surprise me. Again, what Central is saying is that even if the offer is a good offer, I think a great offer, in order to show lack of collusion or arm's length negotiations, you have to turn it down and you've got to start arguing about the amount. That's crazy. That doesn't make any sense. No, the point is what a court looks at to determine whether the settlement is a product of arm's length negotiations or whether it was collusive. If I understand what you're saying, your position is that we should not be concerned if there was a conversation between Mr. Ellis and Mr. Wonka in which they said, let's add up the Central policies. They add up to $14 million. Is $14 million OK with you? Sure. It's OK with me, too, and we'll just agree to pursue Central for payment. We should not be concerned with that. Actually, there's no evidence that that's what happened, but I would say, no, you should not be concerned with that and for two reasons. The first reason is, from the plaintiff's standpoint, the class-action plaintiff, they came up with a number that would fit within the insurance. That's fine. From Mr. Ellis' point of view, who's only interested, he doesn't have any obligation to Central. His only interest was his client. Why would it be unreasonable for him to agree to a settlement in which his client doesn't pay any money? It would be malpractice to turn that down. Guillen recognized that problem. And Guillen said, it's OK as long as the final amount, the $14 million, is objectively reasonable to a prudent uninsured. Then we get rid of all of those other issues because collusion, frankly, is in the eyes of the beholder. Any collusion in one case, Central even admits you can have a collusive settlement that would be enforceable under Guillen. They admit that in their brief. Counsel, shouldn't the court be considering all these facts because Guillen says the court should consider the totality of the circumstances. Aren't these circumstances that we should consider? Yes, but it's the totality of the circumstances from the point of view of a prudent uninsured. That's proof. So what is the totality of the circumstances? I think you have a sufficient totality of the circumstances in this record to make a decision that it was objectively reasonable. You know what their potential liability was. You know what the amount of the settlement was. You know how risky the potential defenses were. That's the totality of the circumstances. The other stuff, it's really not relevant because ultimately, Central couldn't have done anything about the settlement. MIOTA is very clear. The Lay case is clear on remand. When the insurance company surrenders control of the defense and independent counsel is chosen, they don't have a right to object to the settlement anymore. They don't have a right to require notice, no matter what the policy says, because they've lost that right by their conduct. That's what the case says. That's what MIOTA says. That's what Lay says on remand. Counsel, will you proceed and summarize your other three points, please? I will try to do that as quickly as I can. Actually, there's only two, because we dealt with GM being reasonable. And we dealt with whether we had notice. Just to conclude your argument. The only other point, and I'll just say it quickly, was the buyout effective against claimants. The court, Justice Mason, brought that up. And the answer to that is no. RAGAR controls. This is when interests vest. They can't, in an insurance policy, you can't then take them away. Olson didn't affect that. What Olson did, Supreme Court case in Olson, it reversed Bay, which I think was in 1800. It's a really old case. RAGAR didn't even rely on Bay. What Olson said is that when private parties are negotiating, the rule might be different. It did not deal with the public interest that's involved in the insurance policies. And which RAGAR mentioned. They said an insurance policy is not just a private contract. There are public policy issues. That makes it different from the restatement rule, which is why the comments to the restatement, which Olson adopted, specifically said that in the situation that we have when an insurance policy is involved, the rule remains what it was under RAGAR. That you cannot affect the rights of claimants once they invest it without their permission. So in summary, Your Honor, I would say Gann controls. We have sufficient evidence in the record to show it was objectively reasonable. And the case should be reversed. Thank you, counsel. I hope I still have five minutes for rebuttal. You certainly do. Thank you. Mr. Savino? In my argument, I intend to address each and every one of the questions that you asked counsel a moment ago. Because at the root of this case, if I step aside from all of the written submissions, from every case that the lawyers in this proceeding cited, and simply apply what my mother taught me, common sense, and this was not the conduct of a prudent uninsured, not even close, and summary judgment on that point should be granted to Central Mutual. But let me return to a few points. In fact, for purposes of meeting the points raised by counsel, I'm going to address each and every one of them. And I'd like to start with the notice issue. Since Central Mutual is not in breach to its insured tracies, and since tracies never provided Central Mutual notice, never, not once, of the $14 million consent settlement judgment in Lake County regarding the liability suit, then the law is clear. Central is not bound to that settlement, and nothing should be taken from Central because of that fact. Did Central ever go into the Lake County court after it became aware of the settlement and say we had a right to be heard? Central immediately commenced the declaratory judgment suit. It picked up the defense of its insured. It was not in breach. It was not a party to the Lake County liability suit. I understand that Central didn't get notice and didn't know before the settlement was approved, but at any point did Central go to Lake County and say to the judge, you know, this representation that we've abandoned our insured is not true, and we were entitled to notice? Well, Your Honor, may I again apply common sense? We had no notice that that was even going on. In fact, if I may, and this is a point that overlaps the issue of notice and the deception, and I underscore the word. This is a very, very serious case. Deception of Central. On December 10th, I think it was, Mr. Ellis, who requested that Central retain him as Tracy's independent counsel, wrote to Central and said to Central his goal was going to be, now this is in December, his goal was going to be to attack the viability of the class. He represented to Central, few people really participate in these cases. A lot of people opt out. He further promised to Central, I am going to wrap my arms around the facts and the law, and I will further contact you and report to you. He didn't do that. Mr. Ellis didn't owe any duty to Central, did he? He represented Tracy's. Well, I guess two things. One, he was being paid by Central, and second, Your Honor, a lawyer, an officer of this court, writes to Central Mutual Insurance Company and states to Central Mutual just what I've outlined for you and you've read in this record. I'm going to attack the class. I'm going to be in touch with you. I'm going to wrap my arms around the facts and law. He was not faithful to one of those promises. So even if they are right, and they are certainly not, that the law didn't require them to give us notice so that we could hire a lawyer and be in Lake County, even if that is wrong, and it's not, Mr. Ellis made a promise. As a lawyer, he made a promise. He said, I will report to you. I will wrap my arms around the facts and the law. And by the way, he said that in December. And you asked counsel questions. I'm sorry, I think it was Judge Kuczynski asked counsel questions. Well, what about all those emails? Yeah, he wrote to Central in December saying all the things that I've just told you, yet throughout the month of November, before he could put an appearance in the case, Mr. Ellis, an officer of the court, was writing to the Plaintiffs' Counsel. Dear Brian, call me. Tracy's on board. I'm going to get the settlement in 30 days, Mr. Ellis told Tracy. But when speaking out of the other side of his mouth to the party that was paying his fee, to whom he represented that he would report and wrap his arms around the facts of the case, he said to them, nothing. Not one word that the case is going to be settled. Not one, Your Honor. So when you ask me the question, would Central appear in Lake County and object to that settlement? Central is sitting in its office in Van Wert, Ohio, relying on the words of a lawyer to whom they are paying fees that he's going to attack the case. Meantime, he's telling the lawyers, who, by the way, aren't even here today, that he's going to settle with them. And then you know his response when we address that, that affront to this court, that perversion of justice? You know what he said? He said, well, Central and Ellis stated it here. He said, Central wasn't my client. My only client was Tracy's. So my interest is only securing her best interest. By lying to Central? Oh, I get it. It's okay for Mr. Ellis. He can go rob a bank as long as it's in the best interest of Tracy. That can't be justice. That's a distortion of the legal system. Further distorted, because you asked questions of counsel, which he skirted. Then when Tracy went to Lake County, having lied to Central, as I've just outlined, you know what they told Judge Hoffman? They said Central disclaimed the duty to defend, deceiving the court into a belief that Tracy had been abandoned when in fact her fees were being paid. Then I might add, because it doesn't stop there, then I might add, later on in her affidavit and her representations to the court, she said, I then had to go out and hire my own lawyer. What another deceitful statement to the court, when in fact Central had hired the very reputable firm of Leahy, Eisenberg, and Franco here in Chicago, who was representing Tracy, got one of the counsel in the class action dismissed and testified in this case on the issue of what a prudent uninsured would have done. He said, absolutely. I would have packed the class. I would have brought third-party actions against the facts classes who represented to Tracy that every single one of those facts were prescreened and would not violate the TCPA. Okay, so let's assume. I understand your point. Let's assume that Central was entitled to notice and that the question therefore is, was the settlement reached in Lake County reasonable? Isn't that a question of fact? You're contending on a field that should be resolved as a matter of law. No, I most seriously and purposely say to you, to all of you, that on this record, summary judgment for a host of reasons should have been granted to Central Mutual. On this record, Your Honor, this was not the conduct of a prudent uninsured. This was the conduct of a sham defense.  and Central should not be bound and summary judgment, yes. Yes, on this record, should be granted. I should go out. Central should go and spend more money to take that position that will not change the exchange that Judge Kuczynski alluded to and to which I have addressed is not going to change the fact that Mr. Ellis, who put himself on Central and asked for Lady Eisenberg to be substituted, thrown out of the case. He owed an obligation of truthfulness, of faithfulness. It was breached. And yes, on this record, summary judgment should be granted to Central. The trial court made an error in that regard, Your Honor. This is not the conduct of a prudent uninsured. May I stay with your question on that for a moment? Would a person, who I might add, in fact, let me start that over again because when I step back from Gann and all of the cases since Gann and have followed Gann, the test is whether Tracy's, Tracy's was a prudent uninsured. It isn't a test of the person on the street being a prudent uninsured. It's under the totality of the circumstances as you mentioned, that Tracy was facing. And the totality of those circumstances that Tracy was having its defense paid for. Oh, and by the way, you could read these briefs. There's not one word, not one word in these appellate submissions that somehow Central breached its duty because it didn't pay the fee that Mr. Ellis, the unfaithful Mr. Ellis, asked for. In fact, perhaps not in the record, but as an officer of the court, I will tell you, Central didn't bill invoices for Mr. Ellis. He never objected to the fees. The fees weren't the issue for Mr. Ellis. The issue for Mr. Ellis and Mr. Ronson and Mr. Bach and Mr. Anderson was simply a sham defense. Let's keep Central in the dark. And they accepted that and they thought they were going to get away with it until we started our lawsuit, until we attacked the unreasonableness of the decision to settle and the amount. So now Tracy- Let me ask you one thing. I understand that you feel passionately about- I do. It comes out in your brief, but many insurance companies faced with a peppers issue where there is an irreconcilable conflict between the insurance company and the insurer. They have their own counsel monitoring the underlying action, precisely for the reasons that you articulate. That is, they'd like to be kept apprised and they cannot rely on counsel for their insurer to do that because of the conflict. And as counsel says, as Mr. Ellis said here, not to worry,  I apologize, but maybe- I understand the facts. I understand what Mr. Ellis said. What Mr. Ellis said cannot create a duty on him where the law does not impose one. The law says, in the case of a peppers conflict, Mr. Ellis owes his duty to the insurer. He can write letters to Central and say, I'll keep you posted, but that's not an enforceable duty under the law. But, Your Honor, may I ask, please, that we be mindful of the fact that it isn't just that he made a statement, a promise, which I think a lawyer should keep to the person who's paying his bill, but please, and I underscored it, but I must underscore it again, at the same time, with the same pen, he wrote saying what you apparently, and I apparently understand he said to Central, but at the same time, he wrote to his so-called adversary, as part of this sham, saying, we're going to settle in 30 days. I've prepared the settlement agreement. Tracy's on board. Lady Eisenberg is only in it for purposes of damages control. That's so much more than any of the cases that we've cited. But the other assumption... It may go to the collusive nature of the settlement. It does not operate to create a duty where none exists. And my question is, Central, being a sophisticated party, could have had Mr. Offenbach or anybody he chose to file an appearance in Lake County to monitor the litigation precisely to avoid. Mr. Ellis stated again, and I think that there is an estoppel that takes place here when he says to Central, in so many words, I've got this under control. So we were materially misled by his statements, relying on the belief that he would do what he said he would do. And I find it difficult to understand then how somehow Central then is imposed with some responsibility to, independent of what Mr. Ellis stated, to do something extra. When Mr. Ellis said, I've got it under control, he went so far as to say in his letter, as you can see, I'm very experienced in these matters, and I want to represent Tracy's interests. And Central complied, relying on what he said. But more to the point, I don't want to so only rely on Mr. Ellis's untruthful, but nevertheless, his statements to Central. The law is clear, whether it's Gein, whether it's Alliance, whether it's Stonecrafters, and I must emphasize something from Stonecrafters in a moment. The law does require them to provide us with notice. Again, Gein, Stonecrafters, this court, and the Rosalind case. Even if the insurer is in breach, even if the insurer is in breach of its duties to its policyholder, notice is still required. And you know how they respond to notice? In their briefs, and as they stood here? They conflate the topic of notice with the topic of consent. And they say, well, Central didn't have to consent to this settlement. I'm not talking about settlement. Excuse me, consent for the settlement. Central is talking about, you have to give us notice so that we can go out and hire a counsel to do what Your Honor suggested. But these lawyers know full well, the lawyers that represent Iblis, they know full well what their obligations are. Why is that? Because in one of the cases that we've cited to support the proposition that if you don't give us notice, you don't take from us, we're not bound, was their own case. Stonecrafters allow me just to quote, Without a hearing, during which the plaintiff presented facts regarding the reasonableness of the settlement, and the insurer is present to offer evidence in rebuttal, as set forth by Guillen, the trial court has no basis, no basis to find that the decision to settle was reasonable, that the amount of the settlement was reasonable, or that the damages amount to, that the damages that they agreed to was reasonable, if you don't give the insurer notice. And Stonecrafters contemplates the evidentiary hearings that you say isn't necessary in this case. Well, oh, I say it was necessary when it was conducted, they should have given us notice. But now, having failed to give us notice, we're not bound to that settlement, and they're bound to whatever the terms of the settlement is that might otherwise be in place between them and Tracy's. But that settlement cannot be imposed on Central. What a travesty of justice to allow the unfaithfulness, the misconduct, the sham defense, to allow that now to be a do-over? Let's go back to Lake County and do it right the second time. That's not fair to Central. They decided to distort the system. They decided to ignore the case that they handled, Stonecrafters. They decided to ignore Guillen. Now they must live with the consequence, and the consequence is you cannot impose that settlement on Central. Think about it. If you were to allow that to happen, think about it. What would happen, not just here, but in any state in the United States? Let's try to get away with it, and the worst that can happen is that a court will remand it back for a hearing so they can get it right the second time. Let me direct you to a different issue that you said you wanted to address, and that is the buyout of the advertising injury coverage, which you say was pursuant to a settlement agreement with Central's insurance. That settlement agreement is not in the record, is it? The settlement agreement between Central and Tracy's, the actual documentation of it is not in the record. I don't believe it is, but I believe there's reference to it in the matters before the trial court that are part of this record, and the simple fact of the matter also, Your Honor, is that the settlement agreement was a confidential settlement agreement, and we therefore did not make it part of this record, but there's no dispute between the parties. If Central wants it, go ahead. I'm sorry. We put things under seal. It could have been here under seal, too. We are happy to provide it for the court if it can be under seal, but there is no dispute respecting the fact that there was the buyback of the Answer the white case. Answer the white case, there was the buyback, yes. I have a slightly different question. Did you get any service at Summons on the Lake County case at all? Did you get any notice that there was a case in Lake County at all? When it started, did you know there was a case in Lake County? We did know that there was a case in Lake County, yes to your question. Yes to your question. Among the reasons why we then commenced a declaratory judgment suit in Cook County. So following that case in Lake County was certainly well within your capability. Following the, if I understand your question, following the filing of Lake County's suit, there was a tender to Central. Central responded to the tender and in Cook County made, for example, an application much like the one that we've made here, not to be bound to the settlement for the reasons that I've articulated. Was there a settlement agreement? Well, we never knew of the settlement, I'm sorry, which the settlement agreement in Lake County? Yes. Yes, that was. What I've been trying to figure out is why was this case filed in Lake County? They're not alleging that Idlis lives in Lake County, they're alleging that Tracy's does business in Lake County, but the only three faxes attached to the original complaint in Lake County, one of them has an 847 number, which clearly is not Lake County, and the other two, the fax numbers are not there. I don't know whether they're obscured or just inadvertently or advertently they're not there. All the attorneys are in Cook County, Tracy's is in Cook County, so I was just trying to figure out if going to Lake County to begin with was a sneak play to keep you guys in the dark. I've not had the opportunity to depose Mr. Ellis. I don't think I ever need to because I believe summary judgment is here, but you can bet that if summary judgment isn't granted, I intend to sit at a table with Mr. Ellis and cross-examine him on why he never, to this court, told you, in this court, never explained why he told Central one thing, that he's going to go out and attack, yet for a month prior, and continuously from November 13th until January when the case settled, why he never told Central, never reported to them, told Central a word about the settlement so that they could go out and get Pepper's counsel to review the proceedings in Lake County. And I hope that it is reasonable for Central to have relied on that statement. I believe it is, and want the statements that Mr. Ellis said, because that deprived us of our ability to knowledgeably proceed and review what was taking place in Lake County. We have not gotten any word from Mr. Ellis that there was going to be a settlement. Quite the opposite. Mr. Ellis led us, Smith led us, and we relied on his statements as a lawyer who we are paying, and I do think he has, to Judge Mason's point, I think he does have a duty to us once we're paying his fees, a duty that he completely abandoned. But there was a deception upon Central, there was a distortion and fraud on the court, and then there was this conduct of Tracy that I wanted to review for a moment, because there was a statement made by counsel, if I may, who said that the Supreme Court and the TCPA cases have said, well, you can't get contribution. And to some extent, in the briefs filed by counsel in these matters, they say, what's the difference? That's their response to the burden that they have on Gideon to act as a prudent uninsured would have acted. What's the big deal? We didn't have to go out in a, and he said it right here, $60 million case. We didn't have to go out and file third-party actions against those who represented to Tracy that the people who were receiving the faxes were prescreened for receipt. We didn't have to go out and file those third-party suits, but even if we did, they say in their brief, I think it's on page 11, they say in their brief, no big deal, because Tracy still would have been liable. And they made that statement in their briefs after, in another case in which they were involved, they knew, or certainly should have known, or certainly should have known today before it gets to this podium, that the FCC has already stated, with respect to TCPAs, in a ruling in 2013, before these briefs were filed, it is not a strict liability statute, they said. You know what the FCC said? Is this in your brief? This was in, this case came to my attention. My question is, is it in your brief? This point is not in my brief. It is in a case that I wrote to this court, and I've asked the court to reconsider a case that just came down May 14th, where the FCC ruling that there is not strict liability under the TCPA was stated, and I've mailed that to the court. And contrary to everything that was said in their briefs, and what was said here at the podium, the TCPA is not a strict liability statute. Rules of agency apply. So if Tracy, the prudent uninsured, if it was represented to it by fax blasters that these were prescreened, well then Tracy can legitimately pursue and obtain contribution, if not shift liabilities directly to those fax blasters. And that all enters into your analysis of the totality of the circumstances as to whether Tracy's acted as a reasonably prudent uninsured. Under the totality of the circumstances, Tracy, I'll summarize quickly, because there are other points that I would like to address. Tracy's in a $14 million case. Think, pause for a moment. Any person in this courtroom, if you're faced with a $60 million liability, and someone says to you, I'm going to pay for your defense, as Central did, and I'm going to use the lawyer that you want, go ahead and fight it. And you are facing that as you must, Tracy's must, have viewed the case as though it was uninsured. Well, what uninsured person, when faced with that kind of liability, this is why summary judgment is appropriate here, would not start third-party actions against those that represented to her that these recipients were prescreened. What prudent uninsured would have expanded the class like Mr. Ellis did? He expanded the class. The class defined in the complaint was narrower than the class that was ultimately settled. Who, what prudent uninsured would have done that? What prudent uninsured would have just sat by when they knew they had the potential, at least, for a statute of limitations defense? That's not a prudent uninsured. That's an insured that is part of a sham. And by the way, a point that I hope is made in our brief, eight days after Mr. Ellis represented Tracy's, what did he do? He became a client, a plaintiff, in our class action suit, represented by her lawyers who had sued Tracy in the case that was settled in Lake County. This is beyond being an unreasonable conduct under the totality of the circumstances of Tracy. It, again, is not an objective standard. Well, I got a settlement of $14 million on a $60 million case. That's a home run. First, the trial court, Judge Novak, said that's not consistent with Guillen. It's in the record at 55-28. She said Guillen is a totality of the circumstances. The argument that because you got such a great settlement, if it was, that doesn't count under Guillen. That's not the only factor. What prudent uninsured would have said, great, I want to encumber myself with a $14 million judgment. I don't want to attack the class, bring in third parties, challenge the statute of limitations, make an argument that there is no strict liability under the TCPA. What reasonable person? If you want to reject all the law, use your own common sense. Would you encumber yourselves when someone is paying your fee? Would you capitulate or litigate when someone is paying your fee? Mr. Savino, why don't you bring your argument? The other points that I wanted to make, Your Honor, are these. First, on the liquidated damages claim. I'm going to squarely deal with that issue. On the liquidated damages claim, the Supreme Court in lay, I have to start here if I might, the Supreme Court in lay stated no fewer in its decision stated that the $500 in the TCPA is a liquidated damages. In fact, counsel made the statement to you when he spoke that the $500 is the damages you get for violation of the TCPA. That is, much like everything else that's gone on in this case, a totally incomplete and misleading statement. Because the TCPA says you will recover your actual damages or $500, whichever is greater. So the TCPA contemplates a compensatory component of damages, your actual losses, your actual monetary losses, or $500, whichever is greater. The Supreme Court when it was ruling in the lay matter stated at least eight or nine or ten times in its decision, Congress intended, I quote, the $500 liquidated damages, not my words, but the Supreme Court of Illinois' words, saying liquidated damages available under the TCPA. Think of these words, please, as you deliberate on this part of our motion. The Supreme Court said to be $500 liquidated damages, to be at least in part an incentive for private parties to enforce the statute. And why did they say that? Because in the sentence immediately before that, they made the statement that although the monetary impact of a single unsolicited fact is minor, meaning the use of ink and toner, it is nevertheless a cost borne by the recipient and is compensable. Now, understanding that, there is other law in the state of Illinois that we have quoted in the outboard marine case that said that the damages that are paid under an insurance contract are to remedy an injury that was sustained by the claimant. So, now, returning to the construct of the TCPA, there are, as the Supreme Court said, compensable losses. Pennies, they stated. Or you can choose liquidated damages, $500. Insurance does not respond to liquidated damages. It responds, as outboard marine states, for compensatory injury to remedy a wrong. And while the decision in the Supreme Court did say that the $500, and I want to step right up and address this, it does say that the $500 represents the compensable damages. Well, it does to maybe a couple of pennies. But it does, at least in part, they said, represent liquidated damages. And we, as an insurer, do not, does not pay for liquidated damages. That is a strong argument, and it is an argument, yet again, upon which summary judgment should be granted. The last point that I will make, maybe two points, excuse me, is REGOR, the REGOR argument and the buyback. I wanted to return to that because, as I've said, no party in this suit disputes the fact that Central bought back the advertising injury coverage. And REGOR, and I want to make this point, REGOR in 1980, when it was decided, came to the conclusion, based upon an 1884 case, Bay v. Williams, that a beneficiary's rights under a contract get immediately upon the contract. Or, in the context of perhaps an insurance contract, that immediately at the time of the occurrence, when the tort occurred. But then, the Supreme Court in Olson v. Etheridge stated that the law in this state now changes. And vesting occurs, and let me restate it this way, there is no vesting unless the person who claims an interest here, Idlis, either materially justified, materially relied justifiably upon the contract of insurance, well, Idlis didn't even know these contracts existed when he got the facts, or commenced a lawsuit on the contract, and Idlis never did that, and third, that the beneficiary, if you will, assented to the promise that was made between the promisee and the promisor, and Idlis was never called upon for his assent to the contract. So, there was no vesting here that would gather Mr. Idlis into the protections of the insurance contract. Now, simply not the case. The law of Illinois has changed since Regor. Vesting is now different. You don't vest unless you meet one of those three criteria. It was different back when Regor was the law. And then, counsel made one comment that, frankly, I agree with. He said, in the context of liability insurance, there may be a different rule that applies. Where he fell short in his comment is that, in this state, the courts that have enforced Regor have enforced it only in the context, as far as I can tell from our research, and apparently from theirs, only in the context of automobile liability insurance. The only cases that they cite in their briefs to support their Regor argument, that the vesting happened when Idlis got the unsolicited fax, they're all automobile liability cases. Of course. Because there is a very strong public policy. You can't even drive a car in this state, frankly, in any other state, unless you first have insurance. And that strong public policy is advanced because you want to protect the pedestrian and other driving public. So, Regor may remain the law with respect to automobile liability cases, according to the cases that they've cited, but Regor has been entirely trumped by the fact that Olson v. Etheridge in the Supreme Court said, your rights do not vest unless you fall within one of those three that I've outlined. And my last point, and I shall sit down, and thank you for your patience with me. We are mindful, you asked questions of counsel about property damage, I think it was you, Judge Mason, and we are mindful of the decisions in Ex Data and Shellhorn that somehow when you send a fax that can be property damage. And I would like to, with that recognition, awfully for your consideration, a very powerful point. When the Shellhorn decision was written, the court there relied upon two decisions, the Peton decision and the Lyons decision, for the proposition that when someone sends a fax, they really don't intend the injury. And what happened in Peton and in Lyons, that was a misapprehension of the law by the Court of Appeal in Shellhorn. In Peton, a gentleman went to clear some forest area, believing that the forest was owned by him. But it wasn't, it was owned by a third party. So his injury to the third party was unintentional because he thought he owned the trees. And in Lyons, someone made a levy, constructed a levy, and it intruded on property that the contractor thought was his property, when it really belonged to someone else. So the injury, again, was unintended. But let's pause just for a moment, as you consider the property damage part of our case. When a sender sends a fax, there's no misunderstanding that when you send that fax, that it's somebody else's ink that you're using, and fax that you're using, and paper that you're using. Something that is a very large distinction between the cases relied upon in Shellhorn, where they thought it was, I think it's my tree. I can go knock it down. I think it's my property. I think I can build a levy. There's no thought on the part of the sender of the fax that when they send the fax, that it's their ink. Tracy thought she had permission. That's her position. But that does not change. Whether she had permission or not, Your Honor, with great respect, that does not change what I just said. Whether she thought she had permission, there is still an intrusion on someone's property. It turns out that she was wrong, and she's going to be liable for that, but that does not change the fundamental proposition that I've offered you, that when someone sends the fax, they know they're using someone else's property. And we ask you to please consider that as you consider our property damage argument. I've said it before and I'll say it again. Thank you very much for your patience with me and for the reasons that I have articulated. Central seeks summary judgment on this matter. Thank you, Mr. Savino. Thank you, Your Honor. So much to say and so little to ask. I don't begrudge Counsel, though, for taking as much time as he did because, in my opinion, he has a very difficult case to make. I want to hit some issues very quickly, and then I want to hit the main issue. To answer Justice's question about whether this lawsuit was filed in Lake County for some nefarious reasons, two points. One, the fax number was 847. That's a Lake County fax number. All the faxes came out of Lake County. So it should have been filed, and that's where the last fax went from. Secondly, it was disclosed to Central right away. They attended the defense. Central knew about it. That's why they declined coverage. So there was no attempt to hide this case from Central. They knew about it from as soon as Tracy got sued, Tracy turned it over to the insurance company and told them all about it. Secondly, with respect to Ragor, Counsel said, and I'm sure he didn't mean it intentionally, but he said Ragor was based on the old 1800 case base. Well, that wasn't. You can read Ragor from top to bottom, and I have a couple times, and I'm getting old. I might have missed it, but I don't think so. It did not rely on base at all. Ragor relied simply on the fact of the public policy interest inherent in insurance issues. The fact that no other insurance case may or may not, and I can't answer that right now, have referred to Ragor in this context is because it probably hasn't come up Ragor is often decided in the lower court because the system settled law. Olson, on the other hand, had nothing to do with automobile insurance, had to do with private business type situations. And they claimed certified beneficiaries under a private contract. And it overturned base, which Ragor did not rely on. And it was dealing with just a private right of contract. Ragor, on its face, talked about insurance issues, and it talked about the public policy issues and spreading the risk to get as much coverage to as many people. And Olson adopted the restatement, and the restatement and its comments recognized insurance as a separate issue. So Ragor stole the law with respect to vested rights under insurance policies. I want to go back to the Guillen case. And I think this quote, you'll find it on 203 Illinois 2nd, 141 at 163, asterisk 163. Here's what Guillen said, the Illinois Supreme Court said, quoting another case but saying it favorably, neither party to the settlement agreement is motivated to seriously negotiate over issues of damages and liability because the end goal is to structure the deal so that the carrier, a non-party to the agreement, pays. That was the issue that Guillen understood, and they said that's okay as long as the settlement is reasonable from the point of view of uninsured. And I want to point out that their whole argument, that this is unreasonable from an uninsured's point of view, their whole argument is based on looking at Tracy's with their fees being paid, or at least paid in part because they were never paid in full. That, I submit, is not a prudent uninsured. A prudent uninsured is not getting their fees paid by a third party. So if you're looking at it from Tracy's eyes as if she had no insurance, she would not have been getting this paltry $172 reimbursement on her fees. I want to talk about what Ellis said in that letter because that's very important. He did not ask to be retained by the insurance company. If you look at his letter, it's C04934. It's the December 12, 2007 letter from Ellis to Central. He says on the page 2 of that, which is the record site I gave, if it is Central's mutual intensive pay, please confirm it with me as soon as possible. My billing rate is $275 an hour. So he was saying he's charging his client $275 an hour whether or not it's picked up by Central. And Justice Mason pointed out very correctly, he was an independent counsel. And it's important to keep in mind that under PEPRS, if there is a conflict, as there was here, under PEPRS and other cases, the insurance company Central, they specifically say if you want to follow the case, if you want to follow what's going on in the case, you have the right to follow your appearance on your own behalf. They chose not to do so. And they knew that Ellis was representing only the interests, only the interests of Tracy. So you've got to look at his so-called misrepresentation in the letter. First off, he said, I'm exercising damage control. That's what he said. He said the 10,000 names that have been revealed in discovery is possibly damage control. He said there could be no doubt of the seriousness at this time. It appears to me that there is anyway from 400,000 to 100,000 unsolicited facts that went out to potential clients. Then he said, my goal, and this is what counsel relies on, my goal would be to attack the viability of any finding of a class action in the case. From my review, it looks like the names of at least 10,000, Justice Mason is correct, 10,000 customers are known. This may be the level of damage control. So he wasn't promising to vigorously defend. He was promising to exercise damage control. And Central knew that his only interest under the law was Tracy. So he says later, and he made the statement, there's no question, I will be contacting you further about the status of the case as I get my arms around the facts and circumstances. I mean, with all due respect, that's a statement that probably any lawyer would make. It's not something that you can rely on. It's a very vague statement. But counsel would say, and he said it, he said, Don't you think that he would keep informed the party who's paying his fees? He mentioned that a couple of times. Well, he in essence is saying it's okay to have a conflict. Because Central is paying his fees, somehow he has a duty to keep them informed, when the law is exactly opposite. What if, which I think was the case here, they made a strategic decision that they did not want the insurance company to come involved because they, which maybe tried to interfere with the settlement, which it might have done. They might have tried to get the alimony down. They might have tried to do it, but they had the right to follow the case on their own. But from Tracy's point of view, representing his client, he may have decided we don't want to tell the insurance company about it. I don't have any obligation to. The law says I don't have to. So why should I? But according to Council, he should violate his duty to his client because of the same statement in the letter. You pointed out correctly. The law creates the duty, not the statement in the letter. Council also admits, and he said it, I think the court heard it, consent's not the issue here. It's the consent's not the issue. I think that's not the case. It's clear under the law that Central had no right to expect to be given the opportunity to consent. What they're arguing is they should have been notified of the hearing. But in the Roslyn case, they waived any right they had to be notified because they had the right to file their own appearance in the lawsuit in Lake County. They knew they had that right. Peppers gave them that right, and they chose not to do it. So they chose not to follow the case. They chose to do that. Council, please conclude. Okay. I'm going to then just point out one thing in Peppers, and I will leave this quote. Here's what Peppers says, and it applies to this case. This is on 355 Northeast 2nd, 24. It starts off with, because of this conflict of interest, which we have here, serious ethical questions prohibit an attorney from representing both the interests of St. Paul and Peppers. It goes down. Absent the acceptance of the defense by Peppers or the waiver by St. Paul, which did not happen here, Peppers had the right to be defended in the personal injury case by an attorney of his own choice who shall have the right to control the conduct of the case. By reason of St. Paul's contractual obligation to furnish Peppers a defense, it must reimburse him for the reasonable cost of defending the action. Also, St. Paul is entitled to have an attorney of his choosing participate in all phases of the litigation. They didn't pay his defense. They only paid a portion of it. They were supposed to pay a reasonable cost. They chose not to participate in the case. All of the other stuff is name-calling, characterization, rhetoric, and irrelevant. And I think that there is, under the totality of the circumstances, you can find that this settlement was reasonable. At the very least, as I think Justice Mason has said a number of times, that's a question of fact that has to be sent back and resolved before the court, whether it was reasonable or not. Thank you. Thank you, counsel. I'm going to compliment the attorneys for their arguments and their briefs. This matter will be taken under advisement, and the court is going to take a five-minute recess.